## ZACHARIAH B. RODGERS *v.* STATE OF MARYLAND

[No. 92, September Term, 1976.]

*Decided June 6, 1977.*

The cause was argued before SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE and ORTH, JJ., and ROBERT F. SWEENEY, Chief Judge of the District Court of Maryland, specially assigned.

*George E. Burns, Jr., Assistant Public Defender,* with whom was *Alan H. Murrell, Public Defender,* on the brief, for appellant.

*Bruce C. Spizler, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General,* and *Clarence W. Sharp, Assistant Attorney General,* on the brief, for appellee.

SWEENEY, J., delivered the opinion of the Court.

In this case we are asked to decide whether a citizen was entitled to resist an arrest made upon a warrant that was defective on its face. The warrant in question charged that Barry Rodgers (Appellant's full name is Zachariah Barry Rodgers) "unlawfully did assault one Lillie Clark, via telephone, by threatening then and there to do bodily harm unto her in Balto. City, Md. on 5 July 1974." The State concedes that one cannot commit an assault "via telephone." Therefore, as the warrant was defective, the arrest was illegal as a matter of law.

The agreed statement of facts (Maryland Rule 828 g) discloses that on July 7, 1974, Baltimore City Police Department Officers Coates and Morgan were on routine patrol at 1:00 p.m. when they received a call requesting their assistance in serving an arrest warrant. The officers, who were uniformed, arrived at the residence of the Appellant, where they were met by a third officer who was stationed in front of the house. After receiving a description of Appellant, Officers Coates and Morgan checked the rear of the residence and discovered that he had departed. They then began to cruise the area in their patrol car, and approximately 15 minutes later observed the Appellant (whom they recognized from the description) in an alleyway approximately three blocks from his home. The officers left the patrol car, approached Rodgers, and asked him to identify himself, and he replied that his name was "Barry." Officer Coates thereupon advised the Appellant that there was a warrant outstanding for his arrest and asked him to accompany them, in order that the warrant could be

"checked out." [1] The Appellant initially appeared to comply, so the officers neither searched nor handcuffed him as they walked toward the police vehicle.

As they left the alleyway, with the officers flanking the Appellant and Officer Coates holding his elbow, they encountered the mother of the applicant for the warrant, who positively identified the Appellant as the person charged in the warrant. Immediately after the identification, Rodgers turned and grabbed Officer Coates around the waist, causing the officer and himself to fall to the ground. During the ensuing struggle, Rodgers allegedly wielded a straight edged razor and slashed Officer Coates across the arm, inflicting three wounds. Officer Coates screamed to Officer Morgan, "don't let him get my gun, don't let him get my gun," and after hearing this and observing blood "sopping" from the sleeve of Officer Coates, Officer Morgan struck Rodgers on the head and on the hand, subduing him. He was then placed in the patrol car.

Rodgers was charged with resisting arrest and possession of a deadly weapon, and was tried in the Criminal Court of Baltimore by a jury, with Judge Robert Karwacki presiding. At trial, Rodgers testified in his own behalf. He said that police officers came to his home while a domestic quarrel was in progress, and that he then walked away from the house. He testified further that as he was walking in an alley, Officers Coates and Morgan confronted him, told him that his name was Barry Rodgers, and that even though he denied that identity the officers grabbed his arm. He testified that as he was being taken to the police vehicle by the officers, he began arguing with them, inquiring as to whether they possessed a warrant and declar-

---

1. It appears that Officers Coates and Morgan were never in possession of either the original or a copy of the arrest warrant and, therefore, never exhibited a copy to the Appellant. Such a procedure is lawful in this State. Maryland District Rule 706 f. 1. (a) provides that "[a] warrant shall be executed by the arrest of the defendant. The arresting officer need not have the warrant in his possession at the time of the arrest, but in that case, he shall at that time inform the defendant of the offense charged and of the fact that a warrant has been issued, and shall show the warrant to the defendant as soon as possible." *See also* United States v. Salliey, 360 F. 2d 699 (4th Cir. 1966).

ing "I ain't done nothing." The Appellant testified further that in response to his "quarreling," one of the officers struck him in the face, knocking his glasses off. He said that he then grabbed the officer and they both fell to the ground, and that the other officer then twice struck him on the head with a blackjack.

The Appellant denied being in possession of a razor and suggested that the wounds incurred by Officer Coates resulted from glass and other sharp objects in the area. He stated further that the razor that was subsequently recovered was "planted" in the rear seat of the police car.

One Glenda Farabee testified that although she was not aware of how the struggle began, she had observed an altercation between Rodgers and the police. She testified that she saw police beat and handcuff Rodgers and take him away, and that she did not see a razor. It was stipulated in the record that if another citizen named Calvin Knox were present, he would testify in substance to the same events described by Glenda Farabee.

Rodgers was found not guilty of possessing a deadly weapon, but guilty of resisting arrest, and was sentenced to three years in prison. The conviction was affirmed by the Court of Special Appeals, *Rodgers v. State*, 32 Md. App. 90, 359 A. 2d 122 (1976), and on September 29, 1976, we issued a Writ of Certiorari.

At trial, the Appellant filed a motion for judgment of acquittal, alleging that his arrest was unlawful and he was entitled to use reasonable force to resist it. In denying the motion, Judge Karwacki said:

> "It's a question of where you challenge it. What I am saying, when a citizen who is approached by a uniformed police officer who makes his identity known to the Defendant under arrest and pursuant to the command of a judicial officer, that citizen must submit to the arrest and has no power or no right to resist that arrest pursuant to a warrant properly issued by a judicial officer. To rule otherwise, I think, would be to invite chaos."

The Court of Special Appeals concurred, holding that:

"Otherwise stated, an individual may not lawfully use force to resist an arrest where he has been advised by authorized police officers that a warrant for his arrest has been duly issued and that, pursuant to the command of the warrant, the officers are endeavoring to effect his arrest, even though it is later determined at a judicial hearing the warrant was defective. We find no error in the trial judge's refusal to grant the appellant's motion for judgment of acquittal." *Rodgers v. State, supra,* at 97.

It is the correctness of that statement of the law that we are asked to review.

In *Sugarman v. State,* 173 Md. 52, 57, 195 A. 324 (1937), we held that ". . . one illegally arrested may use any reasonable means to effect his escape, even to the extent of using such force as is reasonably necessary", and we held to that view in *Williams v. State,* 204 Md. 55, 102 A. 2d 714 (1954), *Kellum v. State,* 223 Md. 80, 162 A. 2d 473 (1960), and *Childress v. State,* 227 Md. 41, 175 A. 2d 18 (1961). Each of these cases, however, dealt with factual situations in which the arrest was made by a peace officer without a warrant, because of crimes allegedly committed in his presence, and we have never considered heretofore the question of whether a citizen arrested on a warrant which is later determined to be defective is entitled to resist that arrest.

In *Sugarman* and our subsequent decisions on the point, we elected to follow the rule which has long existed at common law and which had been adopted by almost every American jurisdiction. In the case at hand, however, we have no such unmistakable beacon to guide us, for there is ambiguity and confusion as to the extent to which the right to resist an arrest made on a defective warrant existed at common law, and there is no consensus among American authorities as to what defect in a warrant is sufficient to render it null and void.

The common law rule regarding the right to resist an

illegal arrest first appeared in English law more than 300 years ago, in *Hopkin Huggett's Case*, 84 Eng. Rep. 1082 (K. B. 1666). In that case a constable was illegally attempting to impress a man into the Army, when the defendant and others who were onlookers killed the constable, although the victim of the impressment apparently offered no resistance. The court, after reducing the charge from murder to manslaughter, said:

> "[I]f a man be unduly arrested or restrained of his liberty by three men, altho' he be quiet himself, and do not endeavor any rescue, yet this is a provocation to all other men of England, not only his friends but strangers also for common humanity sake, as my Lord Bridgman said, to endeavor his rescue."

Forty-four years later, in *The Queen v. Tooley*, 2 Ld. Raym. 1297, 92 Eng. Rep. 349 (Q. B. 1710), the court spoke even more firmly of the right to resist an unlawful arrest. In that case a constable trying to arrest one Anne Dekins, whom he suspected of being a disorderly person, was accosted by certain persons who assaulted him in an effort to effect her rescue from his custody. The constable persuaded the rescuers that he was about the Queen's business and intended them no harm, whereupon they let him pass. Subsequently, however, they confronted him again and renewed the assault. The constable called another citizen, one Dent, to his assistance, and Dent was killed by one of Dekins' defenders, who was thereafter charged with murder. The court, citing as its authority *Hopkin Huggett's Case*, *supra*, reduced the charge to manslaughter and stated that:

> "[A] man ought to be concerned for Magna Charta and the laws, and if anyone against the law imprison a man, he is an offender against Magna Charta. We seven hold this to be sufficient provocation, and we have good authority for it: in Hopkin Huggett's case . . . (and the case is stronger than that)."

Although in both *Hopkin Huggett's Case* and *Tooley* the court merely reduced a murder charge to manslaughter because of the illegal arrest, the English courts thereafter, with those cases as precedent, uniformly ruled that in cases where one was charged with assault for resisting an illegal arrest, the provocation of that arrest was sufficient to excuse the assault altogether. For example, in *The King v. Thompson*, 168 Eng. Rep. 1193 (K. B. 1825), the court excused an assault on a constable who attempted to arrest a journeyman merely because the journeyman's master "suspected that he had tools of his, and was leaving his work undone," and in *The King v. Curvan*, 168 Eng. Rep. 1213 (K. B. 1826), they freed a man who was charged with assault on a constable who sought to arrest him for "insulting" a third party complainant.[2]

During the 19th and early 20th Centuries the common law rule was adopted by a host of states, and had become the established American rule long before our decision in *Sugarman. See Bad Elk v. United States*, 177 U. S. 529, 20 S. Ct. 729, 44 L. Ed. 874 (1900), and *United States v. DiRe*, 332 U. S. 581, 68 S. Ct. 222, 92 L. Ed. 210 (1948).

In 1861, 195 years after the common law rule regarding resisting an illegal warrantless arrest was adopted in *Hopkin Huggett's Case, supra*, the English courts considered the question of whether that right extended to arrests made upon a defective warrant in *The Queen v. Davis*, 1 Leigh & Cave, C.C. Res. 64 (1861). Davis had been convicted of assault on a bailiff who was attempting to arrest him under the authority of a warrant which was in proper form but lacked certain collateral documentation that was then required. The appellate court was obviously troubled by the question presented, as is indicated by the colloquy set out in the opinion, but affirmed the conviction. A com-

---

2. Under later English law the result would have been different in both Thompson and Curvan, for in both of those cases, as in Tooley and Hopkin Huggett's Case, the resistance involved the use of deadly weapons, which the courts subsequently found impermissible. *See* The Queen v. Wilson, 1 W.L.R. 493 (1955). *See also* Chevigny, The Right to Resist an Unlawful Arrest, 78 Yale L.J. 1128 (1969).

ment of Justice Blackburn, however, seems to have set the stage for the conflict in authorities that has existed thereafter, when he said, at 75:

> "*[P]rovided the process be not defective in the frame of it*, and be issued by a Court or magistrate having jurisdiction in the case, the killing of a minister of justice in the execution of it will be murder, although there may have been error or irregularity in the proceeding previous to issuing the process; for the officer must at his peril pay obedience to it." (Emphasis supplied.)

The English courts thereafter made a basic distinction in cases of resistance to arrests made upon defective process: "A legal process which is valid 'on its face' must be obeyed, but one that is patently unlawful is such a provocation to the citizen that the criminal element in his resistance is reduced, if not removed entirely." Chevigny, *The Right to Resist an Unlawful Arrest*, 78 Yale L.J. 1128, 1131 (1969).

American courts too, in the main, adopted the English rule, excusing resistance to legal process only in those cases where that process was bad "on its face," but they proceeded to differ widely on the question of what constitutes such a fatal defect. For example, in *United States v. Thompson*, 28 F. Cas. 89 (2d Cir. 1823), the court acknowledged that an arrest warrant was void because the act charged had been committed outside the justice's territorial jurisdiction, but notwithstanding this substantial defect, the court held, at 90, that if the warrant "purports to have been issued within [the magistrate's] jurisdiction, and is in other respects formal," the officer is bound to execute it, and the defendant may not lawfully resist.

In *New Hampshire v. Weed*, 21 N. H. 262, 269 (1850), the New Hampshire Supreme Court affirmed a conviction for assault where there was an irregularity in the manner in which the oath was taken from the complainant, stating that if a process is regular or legal in its frame, bears upon

its face all the requisites to make it perfect in form and in substance, and appears to have been issued by a court or magistrate having jurisdiction of the subject matter and of the person or property of the party to whom it is directed, the officer is protected in the service, notwithstanding any error or irregularity; and if the party to whom the process is directed resists the service, he will be criminally liable. The New Hampshire court then went on, however, to give examples of defects upon the face of a warrant sufficient to render it so void as to excuse resistance thereto. Those examples were, *inter alia*, where the requisite seal was not affixed to the warrant; where the name of the sheriff ordered to execute the warrant had been improperly inserted after the warrant was issued; where a constable attempted to execute a warrant outside of his geographic jurisdiction; and where blank warrants were signed by a sheriff and then forwarded to a clerk to be filled out.

At least a dozen states and several federal jurisdictions have wrestled with the problem of what constitutes a fatal defect in a warrant, and the question has been one of considerable appeal to legal writers and scholars. *Appling v. Arkansas*, 95 Ark. 185, 128 S. W. 866 (1910), 28 LRA NS 548; *Crabtree v. Arkansas*, 238 Ark. 358, 381 S. W. 2d 729 (1964); *Connecticut v. Cesero*, 146 Conn. 375, 151 A. 2d 338 (1959); *Gyro Brass Mfg. Corp. v. United Auto., A. & A. I. Workers*, 147 Conn. 76, 157 A. 2d 241 (1959); *Bowers v. People*, 17 Ill. 373 (1856); *Sandford v. Nichols*, 13 Mass. 286 (1816); *Commonwealth v. Kirby*, 56 Mass. (2 Cush.) 577 (1849); *Morrill v. Hamel*, 337 Mass. 83, 148 N.E.2d 283 (1958); *Missouri v. Dickerson*, 24 Mo. 365 (1857); *Montana v. Bradshaw*, 53 Mont. 96, 161 P. 710 (1916); *North Carolina v. Curtis*, 2 N. C. (1 Hayw.) 471 (1797); *People v. Warren*, 5 Hill 440 (1843); *Witherspoon v. Texas*, 42 Tex. Crim. 532, 61 S. W. 396 (1901); *Meador v. Texas*, 44 Tex. Crim. 468, 72 S. W. 186 (1903); *Nolty v. Wisconsin*, 17 Wis. 668 (1864). *See also Brown v. Alabama*, 109 Ala. 70, 20 So. 103 (1895); *Spear v. Alabama*, 120 Ala. 351, 25 So. 46 (1898); *North Carolina v. McGowan*, 243 N. C. 431, 90 S.E.2d 703 (1956); *Toliver v. Texas*, 32 Tex. Crim. 444, 24 S. W. 286 (1893); *Fulkerson v.*

*Texas,* 43 Tex. Crim. 587, 67 S. W. 502 (1902); *Sullivan v. State,* 67 Tex. Crim. 113, 148 S. W. 1091 (1912). *And see The Right to Resist an Unlawful Arrest: An Outdated Concept?,* 3 Tulsa L.J. 40 (1966); *The Right to Resist an Unlawful Arrest,* 78 Yale L.J. 1128 (1969); Annot., 10 A.L.R. 3d 1146 (1966); Annot., 44 A.L.R. 3d 1078 (1972).

Although no consensus exists among the authorities and no unassailable criteria have emerged as to what constitutes a fatal defect, it is apparent that in recent years most courts have tended to narrow the list of defects that are sufficient to render a warrant so void as to excuse resistance to it, while still other courts have resolved the question by totally repealing the common law rule permitting resistance to illegal arrests and ordaining that a citizen submit to any arrest by a known police officer and then pursue his grievance in the courts. *See Miller v. Alaska,* 462 P. 2d 421 (1969); *Idaho v. Richardson,* 95 Idaho 446, 511 P. 2d 263 (1973), *cert. denied* 414 U. S. 1163 (1974); *City of Columbus v. Fraley,* 41 Ohio St. 2d 173, 324 N.E.2d 735 (1975). *See also Daniel v. Florida,* 132 So. 2d 312 (1961), where the rule appears to have been repealed by implication. The right to resist any arrest by a peace officer has been abolished by statute by the California Penal Code, Sec. 834 (a) (West. Supp. 1968); the Delaware Code Ann. Title 11, sec. 1905 (1951); the Illinois Ann. Stat., Ch. 38, Sec. 7-7 (Smith-Hurd 1961); the New Hampshire Rev. Stat. Ann. 594.5 (1955); the New York Penal Law, Sec. 35.27 (McKinney Supp. 1968); the Rhode Island Gen. Laws Ann. 12-7-10 (1941).

Of the recent cases, we find ourselves most persuaded by the decision of the Court of Appeals of North Carolina in *North Carolina v. Wright,* 1 N. C. App. 479, 162 S.E.2d 56, *aff'd.* 274 N. C. 380, 163 S.E.2d 897 (1968). In that case, the defendants were convicted of resisting a public officer who had attempted to arrest them on a capias. On review, the court found that the capias was defective in that it charged the crime of "failure to comply with a court order," which was not an offense under North Carolina law. Notwithstanding the defect, which is almost precisely the same defect in the warrant in the case now before us, the

North Carolina court held that the defendants were not
entitled to resist the officers' attempt to take them into
custody. The court said:

> "When an officer attempts to make an arrest
> without a warrant and in so doing exceeds his
> lawful authority, he may be resisted as in
> self-defense and in such case the person resisting
> cannot be convicted under G.S. Sec. 14-223 of the
> offense of resisting an officer engaged in the
> discharge of his duties. *State v. Mobley*, 240 N.C.
> 476, 83 S.E.2d 100. But when an officer is acting
> under authority of process of a court, a different
> situation exists. In such case if the writ is sufficient
> on its face to show its purpose, even though it may
> be defective or irregular in some respect, yet the
> officer is protected. 'It would be monstrous to lay
> down a different rule. It would put in jeopardy the
> life of every officer in the land. It never could be
> intended that they should determine, at their peril,
> the strict legal sufficiency of every precept placed
> in their hand." 162 S.E.2d 62.

In *United States v. Beyer*, 426 F. 2d 773 (1970), the Court
of Appeals for the Second Circuit reached the same
conclusion as did the North Carolina Supreme Court in
*Wright*, holding that an indictment which was "fair" on its
face supported a warrant for the defendant's arrest, but that
even if the warrant of arrest had been facially defective, the
defendant would not be entitled to resist arrest by physically
assaulting the officers who were executing that warrant. *See
also United States v. Heliczer*, 373 F. 2d 241 (2d Cir. 1967);
*United States v. Simon*, 409 F. 2d 474 (7th Cir. 1969).

Two prior decisions of this Court support the views
expressed in *Wright* and *Beyer*. Although, as we have noted
herein, we have never before been called upon to decide the
question of whether one is entitled to resist with force an
arrest that is illegal because it is made upon a defective
warrant, we have in two civil cases involving malicious
prosecution spoken of the importance that must necessarily

be attached to judicial process, and of the necessity of protecting officers who are engaged in their sworn duty of executing such process. In *Lewin v. Uzuber*, 65 Md. 341, 4 A. 285 (1886), we said that a paper containing no command to arrest, but simply reciting the charge against named parties, is totally void on its face as a warrant of arrest and affords no protection whatever to the constable who acted under it. We went on, however, to speak of the nature of a defect or irregularity on the face of a warrant that is sufficient to vitiate that document and said:

> "It must, however, be distinctly understood, that in what we have thus said in regard to the invalidity of this paper as a warrant, we do not hold that any formal defect or irregularity, even though appearing on its face, will be sufficient to vitiate such a writ, and render the magistrate or constable liable in damages for issuing it or acting under it. *On the contrary, the defect must be so glaring and palpable that any person of ordinary intelligence by merely looking at and reading it, will at once pronounce it null and void, and of no effect as a warrant.*" 65 Md. 349. (Emphasis supplied.)

In *Smith v. Brown*, 119 Md. 236, 246, 86 A. 609 (1913), another action for malicious prosecution, we quoted the above comment from *Lewin* and added that in the case then before us:

> "[T]he offense here attempted to be charged is not stated fully in the language of the statute and may not state the offense with sufficient fullness and completeness to make it the statutory offense thereby intended to be charged or stated, nevertheless the defects therein found are not so glaring and palpable that the constable serving the warrant, a person of ordinary intelligence, but not versed in law, would probably detect in reading it."

We believe that this language applies to the case now under consideration.

Although it does not appear that the Supreme Court has ruled on the precise point now before us, we are satisfied from the decision of that Court in *Walker v. City of Birmingham*, 388 U. S. 307, 87 S. Ct. 1824, 18 L.Ed.2d 1210 (1967), that our views coincide with those of the Court on the question of the proper forum for a challenge to the validity of judicial process. In *Walker*, an injunction had issued from an Alabama state court enjoining certain groups from participating in street parades without first obtaining a permit, as required by a Birmingham ordinance. The citizens paraded in violation of that injunction and were arrested for the offense. The Supreme Court pointed out probable constitutional defects in the municipal ordinance but held that the citizens should have attacked the injunction and the ordinance in court. The Court said:

> "This Court cannot hold that the petitioners were constitutionally free to ignore all the procedures of the law and carry the battle to the streets ... [r]espect for judicial process is a small price to pay for the civilizing hand of law which alone can give abiding meaning to constitutional freedom." 388 U. S. at 320-321.

In 1958, in an address to the American Law Institute, Judge Learned Hand said:

> "The idea that you may resist peaceful arrest ... because you are in debate about whether it is lawful or not, instead of going to the authorities which can determine, ... [is] not a blow for liberty but on the contrary, a blow for attempted anarchy." 1958 Proceedings, American Law Institute, at 254.

Judge Hand's comment was intended to apply to any arrest made by a peace officer, but it certainly has overwhelming application to those cases, like the one at hand, where an officer makes an arrest upon a warrant that is defective through no fault of his. At least where a citizen resists with force an illegal arrest made by a police officer without a

warrant, that force is directed at the individual responsible for the improper deprivation of the citizen's liberty; but the officer engaged in carrying out the mandate of a court that he arrest an individual named in a warrant is blameless if that warrant has been issued in error, and it would be a betrayal of our duty to such an officer to say that the citizen is entitled to inflict injury on the officer because the courts had erred in issuing the warrant. Indeed, to sanction resistance to arrest under these circumstances would be to invite the very destruction of the entire judicial process, for we would then impose upon every police officer commanded by a warrant to make an arrest the duty to make his own independent judgment as to whether the judicial officer had properly performed his duty in issuing the warrant. Such a practice would make a mockery of the courts and place an impossible burden on police officers, who, however well trained in the performance of their police duties, cannot be expected to have sufficient training in the law to make a reasoned judgment as to whether the face of every arrest warrant contains any fatal defect or irregularity.

The Appellant, of course, does not argue the *desirability* of seeking redress for an illegal arrest on the streets rather than in the courts, but, instead, asserts that it is fundamentally unfair to punish a citizen who has been reasonably provoked to resistance by an unlawful arrest. We do not agree with that contention, at least in a case such as the one at hand, where the arresting officer played no part in the composition of the charge which rendered the warrant defective. In such a case we can think of nothing more appropriate or more fundamentally fair than that the arrested person seek redress for his wrongs in court, rather than be seeking to do violence to the person of the court's innocent emissary.

Our concerns about the right to use force to resist an illegal arrest made upon a defective warrant arise in large measure, as we have noted, from the right of police officers to be free from attacks upon their person. But our concerns are not limited to the safety of police officers and extend in equal measure to the well-being of our citizens, including

those subjected to an illegal arrest of this kind, for a dispute between an unarmed citizen and an armed police officer will most frequently result in injury to the citizen — at least in disproportion to the injuries received by his armed opponent. And even where the citizen may possess and attempt to use a deadly weapon, the probabilities are that he will suffer the greater damage to his person because of the superior skills of his police opponent. Nor can we ignore the fact that combat on the streets between police officers and a citizen resisting arrest can and often does involve passersby or other citizens, some of whom may be inclined to enter the fray, to their detriment — others of whom may suffer injury merely by being in the way. In this regard, the Supreme Court of California, in *People v. Curtis*, 74 Cal. Rptr. 713, 70 Cal. 2d 347, 450 P. 2d 33, 36 (1969), said:

> "While defendant's rights are no doubt violated when he is arrested and detained a matter of days or hours without probable cause, we conclude the state in removing the right to resist does not contribute to or effectuate this deprivation of liberty. In a day when police are armed with lethal and chemical weapons, and possess scientific communication and detection devices readily available for use, it has become highly unlikely that a suspect, using *reasonable* force, can escape from or effectively deter an arrest, whether lawful or unlawful. His accomplishment is generally limited to temporary evasion, merely rendering the officer's task more difficult or prolonged. Thus self-help as a practical remedy is anachronistic, whatever may have been its original justification or efficacy in an era when the common law doctrine permitting resistance evolved. . . . Indeed, self-help not infrequently causes far graver consequences for both the officer and the suspect than does the unlawful arrest itself. Accordingly, the state, in deleting the right to resist, has not actually altered or diminished the remedies available against the

"illegality of an arrest without probable cause; it has merely required a person to submit peacefully to the inevitable and to pursue his available remedies through the orderly judicial process."

We are not unmindful that under present conditions the available remedies for unlawful arrest — release, followed by civil or criminal action against the offender — often may be inadequate. This circumstance, however, does not elevate physical resistance to anything other than the least effective and least desirable of all possible remedies; as such, its rejection, particularly when balanced against the State's interest in discouraging violence, cannot be realistically considered a deprivation of liberty.

We affirm the judgment of the Court of Special Appeals. We agree with that Court that our holding in *Sugarman v. State, supra,* and our other decisions adhering thereto — which we have no occasion to re-examine today — have no application to a situation where an arrest is made by a peace officer on a warrant duly issued by a judicial officer. We cannot believe that the General Assembly, having made peace officers agents of the court for the purpose of serving arrest warrants, could have intended that citizens arrested pursuant to such a warrant be free to dispute its validity by doing violence to the officer serving the judicial process. Moreover, to do other than uphold the Appellant's conviction in this case would be to reach a ridiculous result, as he is attempting to justify his use of force in resisting this arrest by pointing out a defect in a warrant that neither he nor the arresting officers saw until after the arrest had taken place.

*Judgment of the Court of Special Appeals affirmed; appellant to pay the costs.*